IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA,

v.

SIDNEY EDIKE,

      Defendant

CRIMINAL ACTION NO.

1:18-cr-00375-MLB-CMS

## REPORT AND RECOMMENDATION

This case is before the Court on Defendant Sidney Edike's ("Defendant") Motion to Suppress Evidence [Doc. 19], Perfected Motion to Suppress Evidence and Request for a <u>Franks v. Delaware</u> Hearing [Doc. 35], and Motion to Suppress Statements [Doc. 20].

## I.     BACKGROUND

On September 25, 2018, a grand jury in the Northern District of Georgia returned a thirty-count indictment against Defendant, charging him with wire fraud, access device fraud, and aggravated identity theft.  [Doc. 1].  On February 2, 2019, Defendant filed a motion to suppress statements he made during the execution of a search warrant at his residence [Doc. 20] and a motion to suppress evidence obtained during that search [Doc. 19].  Defendant later perfected his search warrant motion and requested an evidentiary hearing pursuant to <u>Franks v. Delaware</u>, 438 U.S. 154

(1978).  [Doc. 31 at 3–5, 66–67; Doc. 35].  I held an evidentiary hearing on the motion to suppress statements on March 19, 2019, after which a transcript was prepared.  [Doc. 31 ("Tr.")].  The Government filed a response to the perfected motion to suppress evidence and request for a Franks hearing [Doc. 36], and both sides filed post-hearing briefs related to the motion to suppress statements.  [Docs. 38, 41].

## II.    DISCUSSION

### A.    Perfected Motion to Suppress Evidence & Request for a Franks Hearing

On December 30, 2016, I signed a warrant authorizing law enforcement to search a residence at 258 Wallace Hill Court in Lawrenceville, Georgia for, among other things, evidence of wire fraud, identity theft, theft of public monies, access device fraud, and conspiracy to launder money.  [Doc. 19-1 at 1–3].  The probable cause for the warrant was based on the sworn testimony of Justin Fletcher, a Special Agent with the United States Department of Treasury.  [Doc. 19-1 at 4–21 ("Fletcher Aff.")].

In his affidavit, Special Agent Fletcher stated that the Criminal Investigation Division of the Internal Revenue Service ("IRS-CI") was investigating a fraudulent tax refund scheme involving more than 400 false tax returns that were filed listing bank accounts at Regions Bank.  [Fletcher Aff. ¶ 23].  These tax returns were filed

with wage and withholding amounts that did not match IRS records for the individuals listed. [Id.]. Records from Regions Bank showed that many of the accounts were opened online with false Georgia driver's license numbers. [Id. ¶ 24]. Many of the bank accounts identified as being part of the scheme were opened in the names of unsuspecting individuals who did not authorize the bank accounts to be opened, and the driver's licenses listed were false. [Id.]. Many of the fraudulently-obtained tax refunds were deposited into the fraudulently-opened Regions Bank accounts; the funds were later withdrawn from ATMs of other banks, including Bank of America and Wells Fargo Bank. [Id.].

The affidavit states that the agents reviewed, among other things, photos and videos documenting these ATM withdrawals. [Fletcher Aff. ¶ 25]. According to the affidavit, that evidence showed four different people withdrawing funds using debit cards associated with the fraudulent Regions Bank accounts, with the majority of the ATM transactions having been done by one particular individual ("the suspect"). [Id.]. ATM surveillance images show the suspect making more than fifty unauthorized ATM withdrawals. [Id. ¶¶ 47–48]. The investigation revealed that in addition to making ATM withdrawals of the fraudulently-obtained funds, the suspect was also making night-drop deposits into the fraudulent Regions Bank accounts. [Id.].

According to the affidavit, the agents believed that Defendant was the suspect they were looking for, i.e., the primary person who had been withdrawing the fraudulently-obtained funds from various ATMs and making night-drop deposits at Regions Bank.  [Fletcher Aff. ¶ 25].  The agents' conclusion that Defendant was their suspect was based on the following evidence:

- The agents knew that the scheme involved an address on Chapel Station Drive in Lawrenceville, Georgia, which had been listed on two of the fraudulent Regions Bank accounts.  [Fletcher Aff. ¶¶ 37–40].

- Agents identified a phone that had been used to access the fraudulent Regions Bank accounts on multiple occasions, and they obtained a ping warrant for location data for that phone.  The data showed a particular cluster of cell phone pings near Chapel Station Drive in Lawrenceville.  [Id.].

- The agents used the Google Maps street view to look at the residences near the ping cluster.  One image showed three black men standing in the yard of 258 Wallace Hill Court, and one of those people matched the description of the suspect.  [Id. ¶ 41].

- A public records search revealed that the home located at 258 Wallace Hill Court was owned by Defendant.  [Id. ¶ 42].

- The agents pulled Defendant's Georgia driver's license photo from the Department of Motor Vehicles ("DMV") and determined that the photo on the license matched the image of the suspect.  [Id. ¶ 41].

- The photo on Defendant's driver's license was taken on April 28, 2016 and showed Defendant wearing a gray t-shirt.  [Id. ¶ 43].  An ATM surveillance photo from the same day showed the suspect making unauthorized ATM withdrawals using three different ATM cards and wearing a gray t-shirt that matched the shirt Defendant was wearing in his driver's license photo.  [Id. ¶ 44].

4

Defendant argues that this evidence is insufficient to establish probable cause to search his home.   Alternatively, he argues that the affidavit contains material omissions and misstatements, and that the Court should hold a hearing to inquire into those alleged omissions and misstatements.

Affidavits supporting search warrants are presumptively valid.  See Franks, 438 U.S. at 171.  "Thus, a defendant is generally not entitled to an evidentiary hearing on a motion to suppress based on alleged misrepresentations or omissions in a search warrant affidavit."  United States v. Price, 582 F. App'x 846, 850 (11th Cir. 2014).  The allegations of deliberate falsehood or of reckless disregard for the truth must be accompanied by an offer of proof, including a statement of supporting reasons and affidavits of witnesses.  See Franks, 438 U.S. at 171.  "Allegations of negligence or innocent mistake are insufficient."  Id.  If, after setting aside the material that is the subject of the alleged falsity or reckless disregard, "there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required."  Id. at 171–72.  Thus, to be entitled to an evidentiary hearing on a motion to suppress based on misrepresentations or omissions in a search warrant affidavit, a defendant must make a substantial preliminary showing that: (1) the affiant made a false statement; (2) the false statement was made either intentionally or with reckless disregard for the truth; and (3) the false statement was necessary to

the finding of probable cause.  See Franks, 438 U.S. at 171–72.  Material omissions from a supporting affidavit may also give rise to entitlement to a Franks hearing. See United States v. Kapordelis, 569 F.3d 1291, 1309 (11th Cir. 2009).

In his motion (and perfected motion) to suppress, Defendant first argues that Special Agent Fletcher omitted material facts regarding the ping warrant, i.e., that the pings near Defendant's home were designated as "low confidence" and that the location data was merely an estimate and was not related to any GPS measurement. [Doc. 35 at 12–13].  He also states that the pings in question occurred between December 2 and December 6, 2016, while the application for the warrant was not made until December 30, 2016, and all the pings from late December were more than eight miles from Defendant's home and were designated a level of confidence higher than the pings upon which the agents relied.  [Id. at 14–15].[1]

Here, it is evident that Defendant has failed to make a sufficient preliminary showing to warrant a Franks hearing based on omissions regarding the ping warrant data.  Contrary to Defendant's allegations, Special Agent Fletcher never stated in his

---

[1]  In his reply brief, Defendant argues that there was other evidence that pointed to different people and different locations.  [Doc. 37 at 3–4, 13–15].  The fact that other people might also have been investigated and other locations might have been places of interest has no relevance to the issue of whether there was probable cause to believe that contraband or evidence would be found at 258 Wallace Hill Court at the time that I signed the warrant.

affidavit that the phone was pinging precisely at Defendant's house or that the ping data could be used to precisely locate someone.  Rather, Special Agent Fletcher stated that there was a "particular cluster of cell phone pings" in the area of Chapel Station Drive and Wallace Hill Court, which was of interest to the agents because a Chapel Station Drive address had been listed as an address on two Regions Bank accounts that the investigators had identified as being part of the scheme.  [Fletcher Aff. ¶ 40].  Those pings led them to do surveillance via Google Maps, which led them to the 258 Wallace Hill Court house, which led them to Defendant's driver's license photo.  [Id. ¶¶ 40–44].  The heart of the probable cause is the similarity between the driver's license photo and the ATM photos—not the Google Maps images.  Whether the pings were precise or pinged other places at other times is not material to the issue of probable cause.  Defendant is not entitled to a Franks hearing on this basis.

Defendant next argues that Special Agent Fletcher made a material misstatement when he said in paragraph 41 of his affidavit that "one of the individuals standing in the front yard of 258 Wallace Hill Ct., Lawrenceville, Georgia matched the description of the individual that conducted the night-drop deposits in Regions Bank accounts and subsequently withdrew funds from Bank of America and Wells Fargo ATMs."  [Doc. 19 at 4; Doc. 35 at 17].  According to

Defendant, it would have been impossible for law enforcement to identify one of the men from the Google Maps image as being the same man in the ATM surveillance photos because the faces of the three men in the yard—who are all dark-skinned with short hair and of the same height, build, and weight—are blurred out.  [Doc. 35 at 16–17; Doc. 35-2 at 3; Doc. 35-3 at 1].  According to Defendant, the only description that can be made of any of the men in the Google Maps images is "black male of average height, weight, and build."  [Doc. 35 at 17].  Defendant contends that the agent must have lied when he said that the individual on the Google Maps images "matched" anyone, noting that the Google Maps images do not show any faces, while the ATM photos captured faces only and are "extremely grainy."  [Id. at 17–18].

As with the ping warrant evidence, Defendant has failed to make a sufficient preliminary showing to warrant a Franks hearing regarding the Google Maps images. I note initially that Defendant has not provided any offer of proof, much less affidavits or sworn statements, to support his claim that the warrant affidavit was lacking.  Thus, there is nothing to show that this statement was made with reckless disregard for the truth.  It is not inconceivable that the agents thought that one of the individuals in the Google Maps images was the suspect.  While perhaps the agent should not have said in his affidavit that the person "matched" the suspect's

description, it was not unreasonable for the agents to think that the person depicted might be the suspect and follow that lead, which is what the agents did.  They determined who owned the house and pulled that person's photo from the DMV.  It was only after the agents matched the images of the suspect with Defendant's driver's license photo that they sought a warrant.

Defendant has failed to make a "substantial preliminary showing" that Special Agent Fletcher made a false statement or omission, either intentionally or with reckless disregard for the truth.  See Franks, 438 U.S. at 171–72; United States v. Cross, 928 F.2d 1030, 1040 (11th Cir. 1991).  Nor has Defendant shown that even if his version of the facts is true—i.e., that there was no way the agents could have identified him through the Google Maps images—the probable cause determination would be affected.  Id.  Accordingly, Defendant is not entitled to a Franks hearing on this basis either.

In sum, Defendant's motion to suppress the warrant can be adjudicated by reviewing the four corners of the subject affidavit, with no need for an evidentiary hearing.  I turn now to the affidavit itself to determine whether probable cause existed to support issuance of the warrant.

"Probable cause to support a search warrant exists when the totality of the circumstances allow a conclusion that there is a fair probability of finding

contraband or evidence at a particular location." United States v. Brundidge, 170 F.3d 1350, 1352 (11th Cir. 1999). The search warrant affidavit must "state facts sufficient to justify a conclusion that evidence or contraband will probably be found at the premises to be searched." United States v. Martin, 297 F.3d 1308, 1314 (11th Cir. 2002) (quotation omitted). "[T]he affidavit should establish a connection between the defendant and the residence to be searched and a link between the residence and any criminal activity." Id.

"[T]he task of a reviewing court is not to conduct a de novo determination of probable cause, but only to determine whether there is substantial evidence in the record supporting the magistrate judge's decision to issue the warrant." United States v. Bushay, 859 F. Supp. 2d 1335, 1379 (N.D. Ga. 2012) (citing Massachusetts v. Upton, 466 U.S. 727, 728 (1984)). Courts are not to "interpret supporting affidavits in a hypertechnical manner; rather, a realistic and commonsense approach should be employed so as to encourage recourse to the warrant process and to promote the high level of deference traditionally given to magistrates in their probable cause determinations." Id. at 1379 (citing United States v. Miller, 24 F.3d 1357, 1361 (11th Cir. 1994)); see also United States v. Robinson, 62 F.3d 1325, 1331 (11th Cir. 1995) (requiring the reviewer to afford "great deference" to a judicial determination of probable cause to issue a search warrant).

According to the affidavit, the chronology of events was as follows: the agents first identified the pings in close proximity to an address that had been used on two fraudulent bank accounts; then they saw the image of the men in the yard; then they determined that one of the men matched the description of the suspect; then they did a public record search of 258 Wallace Hill Court and learned that Defendant was a listed owner of the residence; then they pulled Defendant's driver's license from the Georgia DMV.  At that point, the agents had matching photos—the driver's license photo and the ATM images of the suspect making fraudulent ATM transactions. Additionally, the agents had the ping warrant evidence placing the offending phone in close proximity to (if not precisely at) Defendant's residence.  The totality of the circumstances in this case allow a conclusion that there was a fair probability of finding contraband or evidence at the 258 Wallace Hill Court residence, and that the warrant was supported by probable cause.   Accordingly, I recommend that Defendant's motion (and perfected motion) to suppress evidence [Docs. 19, 35] be denied.

**B.     Motion to Suppress Statements**

Defendant also filed a motion to suppress a roughly three-hour statement he made to IRS agents on January 4, 2017, when the agents were executing the search

warrant at his house.  [Doc. 20].  On March 19, 2019, I held an evidentiary hearing on the motion.  [Doc. 31 ("Tr.")].

At the hearing, the Government called IRS-CI Special Agents Justin Fletcher and Michael Hammond as witnesses.  Both agents testified that they work out of the Oakland, California office of the IRS and that they investigate tax evasion, money laundering, and other financial crimes.  [Tr. at 9, 47].

Special Agent Fletcher was the case agent.  He testified that as part of his investigation, he had applied for and obtained a search warrant for Defendant's residence on Wallace Hill Court in Lawrenceville, Georgia.  [Tr. at  10].  On January 4, 2017, at approximately 8:00 a.m., Special Agents Fletcher, Hammond, and other federal agents executed the warrant; Fletcher and Hammond were responsible for interviewing Defendant.  [Tr. at 12, 48–49].  There were eleven federal agents present, as well as one non-law enforcement person, a tax fraud investigative analyst.  Local law enforcement was also present outside the house in marked units.  [Tr. at 13].  The agents were all armed, wearing ballistic vests marked "police," and their weapons and handcuffs were visible.  [Tr. at 13–14].

When the agents knocked on the door, most of them had their weapons drawn, but Special Agent Fletcher did not draw his weapon because of his role as case agent and his goal of conducting an interview; instead, he carried a notebook.  [Tr. at 15,

38].  Special Agent Hammond could not recall whether he drew his weapon when they entered the home.  [Tr. at 48].

Upon entering the home, the agents went room to room and brought the five occupants to the living room.  [Tr. at 16].  They found Defendant upstairs in a bedroom and brought him downstairs; they did not handcuff anyone.  [Tr. at 17].

Once everyone was assembled in the living room, Special Agent Fletcher told Defendant that he wanted to conduct an interview of him in the dining room.  [Tr. at 17–18].  Defendant walked to the dining room, at which point Special Agent Fletcher explained the warrant and read Defendant an "in-custody statement of rights."  [Tr. at 19–20, 50–51, 61].  Both agents testified that they did not consider Defendant in custody, but that it was their office's practice to read the statement of rights to everyone they encountered at a search warrant site.  [Tr. at 20, 52–53].  Special Agent Fletcher explained that because their office is in California, which is in the Ninth Circuit, "we go above and beyond."  [Tr. at 21].  Both agents testified that after Special Agent Fletcher read Defendant his rights, Defendant indicated that he understood his rights.  [Tr. at 26, 53, 61].  They also testified that Special Agent Fletcher told Defendant he was free to leave, but that if Defendant left the premises, he would not be permitted to come back into the house until the agents were finished with their work.  [Tr. at 26, 54, 63–64].  According to Special Agent Fletcher, the

13

interview lasted approximately three and a half hours, during which time Defendant never asked to stop for food or water. [Tr. at 26–27]. Special Agent Hammond testified that the interview lasted four to five hours and that he could not recall whether the agents provided Defendant with food or water. [Tr. at 50, 54].

At approximately 9:30 a.m., they took a short break (eight to ten minutes long) so that Defendant could speak with his wife. [Tr. at 27–28, 59]. The agents testified that throughout the interview, their demeanor was "matter of fact," calm, and professional, and they never raised their voices, or made any threats or promises. [Tr. at 28–30, 54–55]. They both also testified that Defendant did not ask to end the interview and did not request a lawyer. [Tr. at 30, 55]. According to Special Agent Fletcher, the interview ended at approximately 11:30 a.m., at which point Defendant returned to the living room where he waited for the search to conclude along with the other occupants of the house. [Tr. at 29, 32]. The interview was not recorded, and Defendant did not execute a signed waiver of his Miranda rights. [Tr. at 33–34, 60–61].

Defendant argues that the statements he made during the interview should be suppressed because he was effectively in custody during the interview and that because he did not execute a written waiver of his Miranda rights, his statements are inadmissible.

14

Once in custody, a suspect may not be interrogated unless he is advised of his Miranda rights, he demonstrates that he understands them, and he voluntarily waives them, either explicitly or implicitly.  See Yarborough v. Alvarado, 541 U.S. 652, 661–63 (2004).  Custody is established if, in light of the circumstances of an interrogation, a reasonable person would have felt that he was not at liberty to terminate the interrogation and leave.  See id. at 663.  The test is objective: whether a reasonable person in the defendant's position would feel a restraint on his freedom equivalent to that normally associated with formal arrest.  See Berkemer v. McCarty, 468 U.S. 420, 441 (1984); United States v. Torkington, 874 F.2d 1441, 1445 (11th Cir. 1989).  The Eleventh Circuit considers several factors in applying this objective test, including whether the officers brandished weapons, touched the suspect, or used language or a tone that indicated that compliance with the officers could be compelled.  See United States v. Street, 472 F.3d 1298, 1309 (11th Cir. 2006).  No particular fact in the "custody" analysis is outcome determinative; rather, the court simply weighs the totality of the circumstances.  See United States v. Lall, 607 F.3d 1277, 1284 (11th Cir. 2010).  Defendant carries the burden of showing that he was in custody, and therefore, that Miranda warnings (and a corresponding waiver of rights) were necessary.  See United States v. de la Fuente, 548 F.2d 528, 533 (5th

Cir. 1977); United States v. Peck, 17 F. Supp. 3d 1345, 1353–55 (N.D. Ga. 2014) (discussing the applicability of de la Fuente).

In support of his contention that he was effectively in custody, Defendant points to the following facts: the agents had their guns drawn when they entered the house; the memorandum of interview did not mention that Defendant was told he could leave; two police cars were parked in front of the house; Defendant was read Miranda warnings, which would make a reasonable person think that he was under arrest; and Defendant is from another country, with little knowledge of our legal system. [Doc. 38 at 3–7]. According to Defendant, these facts would make a reasonable, innocent person believe that he was not free to leave, meaning that the agents should have obtained a written waiver of rights from him. Defendant complains that even though the agents read him his rights, he never actually waived those rights. Defendant argues that because he did not sign a written waiver acknowledging that he understood his rights and wished to speak with the agents, any statements he made should be suppressed. [Id. at 8].

The Government responds, and I agree, that Defendant has not carried his burden of establishing that he was in custody, for Miranda purposes, during his interview. The Government points to the uncontroverted evidence that the interview took place in Defendant's home, that Defendant was told he was free to leave, that

16

Defendant was not physically restrained or handcuffed at any point (either during the search or the interview), that no weapons were brandished during the interview, that the interview was not excessively long, that the agents used a calm, professional tone of voice and did not touch him during the interview, and that no one was arrested at the conclusion of the interview or search.  Defendant has presented no evidence of any threats, coercion, or deception on the part of law enforcement.  To the extent Defendant argues that there was something custodial or coercive about the agents brandishing their weapons while entering the house and doing the protective sweep, this fact alone is not sufficient to establish a custodial interrogation, especially where the weapons are later holstered during the interview.  See, e.g., United States v. Matcovich, 522 F. App'x 850, 852 (11th Cir. 2013) (concluding that the defendant was not in custody despite there being a "police-dominated atmosphere" during the execution of a search warrant where the defendant was told that he was not under arrest, the interview took place at the defendant's home, the defendant's handcuffs—that had been initially applied for officer safety—were removed shortly after the search began, and the agents' weapons were holstered during the interview); United States v. Luna-Encinas, 603 F. 3d 876, 881–82 (11th Cir. 2010) (concluding that defendant was "plainly not in custody" when officers first entered with weapons drawn but "pointed downward in a protective posture

17

and . . . holstered shortly after the initial arrival"). In this case, the uncontroverted testimony showed that the agents who interviewed Defendant kept their handguns holstered at their hips throughout the interview and never touched or gestured toward a gun. [Tr. at 30, 55]. Thus, I conclude that Defendant's statements were not made during a custodial interrogation. See Matcovich, 522 F. App'x at 852.

Because Defendant was not in custody when he made the statements to the agents, a waiver of Miranda rights was not required. The fact that the agents went above and beyond in advising Defendant of his Miranda rights does not transform the non-custodial interview into a custodial interview requiring proof of a voluntary waiver of those rights.[2]

Alternatively, Defendant argues that his statement should be suppressed because it was not voluntary. To be admissible at trial, statements made by a defendant must be voluntary, even if no Miranda violation occurred. See United States v. Bernal-Benitez, 594 F.3d 1303, 1317–18 (11th Cir. 2010). In making this determination, the court considers the totality of the circumstances, such as "the length of detention, the repeated and prolonged nature of the questioning, and the

---

[2] And even if the interview were evaluated as a custodial interview, the evidence shows that Defendant was advised of his rights, he expressly indicated that he understood his rights, and then he implicitly waived those rights when he agreed to be interviewed.

18

use of physical punishment such as the deprivation of food or sleep." Id. at 1319 (quotations omitted).

In support of this argument, Defendant contends that he was threatened, asserting that "agents told him that he would likely go to jail if he did not speak with them." [Doc. 38 at 8]. This contention, however, is wholly unsupported by the record; not only is there is no evidence to support this assertion, both agents credibly denied making such a statement. [Tr. at 37–38, 65]. The undisputed and credible evidence presented at the hearing shows that Defendant was read his rights (even though not required), he said he understood his rights, and then he continued to speak with the agents. The evidence also shows that during his interview, Defendant was not handcuffed, no weapons were drawn, and no promises or threats were made. Finally, the evidence shows that the interview lasted less than four hours, with a break in the middle, and that Defendant never asked that the questioning cease. Moreover, there is an absence of evidence of the kinds of circumstances that would support a finding that the statement was not voluntary. There is no evidence that Defendant was impaired in any way, that he did not understand the agents' questions or had trouble with English, or that Defendant was fatigued due to the length of the interview. This Court has consistently concluded that statements made under such circumstances were voluntarily made. See, e.g., United States v. Vega-Gutierrez,

19

No. 1:15-CR-178-RWS-LTW, 2018 WL 7918059, at *8–9 (N.D. Ga. Nov. 5, 2018), *report and recommendation adopted by* No. 1:15-CR-178-RWS-LTW, 2019 WL 446227 (N.D. Ga. Feb. 5, 2019) (concluding that statements were voluntary where the defendant was initially placed in handcuffs while law enforcement officers secured the residence but the interview did not involve the same show of force); United States v. Badiki, No. 1:17-CR-342-ELR-AJB, 2018 WL 7283636, at *9–11 (N.D. Ga. Dec. 31, 2018), *report and recommendation adopted by* No. 1:17-CR-342-ELR-AJB, 2019 WL 397991 (N.D. Ga. Jan. 31, 2019) (concluding that statements were voluntary where the defendant was interviewed in a private office at her place of work, the nature of the interrogation was cordial and conversational, the defendant was never physically touched, harmed, or threatened in any way, the agents never made any promises to the defendant).

For the foregoing reasons, I recommend that Defendant's motion to suppress statements [Doc. 20] be denied.

### III.   CONCLUSION

For the reasons stated, I **RECOMMEND** that Defendant's Motion to Suppress Evidence [Doc. 19], Perfected Motion to Suppress Evidence and Request for a Franks v. Delaware Hearing [Doc. 35], and Motion to Suppress Statements [Doc. 20] be **DENIED**.

20

I have now addressed all referred pretrial matters and have not been advised of any impediments to the scheduling of a trial.   Accordingly, this case is **CERTIFIED READY FOR TRIAL**.

**SO REPORTED AND RECOMMENDED**, this 8th day of August, 2019.

Catherine M. Salinas
United States Magistrate Judge